Filed 12/22/25  P. v. Ramirez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,  Plaintiff and Respondent,  v.  ALLAN NAYIB MELGHEM RAMIREZ et al.,  Defendants and Appellants. | D084804  (Super. Ct. No. RIF2103388) |

APPEALS from judgments of the Superior Court of Riverside County, Timothy J. Hollenhorst, Judge.  Affirmed as to appellant Ramirez and reversed as to appellant Rojas.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant Allan Nayib Melghem Ramirez.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant Cesar V. Rojas.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

Allan Ramirez and Cesar Rojas appeal from judgments after separate juries convicted them each of first-degree murder in a joint trial, Ramirez as the actual perpetrator and Rojas as an aider and abettor. Ramirez contends the evidence did not prove he premeditated the killing, and the trial court should have granted his motion for mistrial based on the prosecutor's failure to redact from his postarrest statement a stray comment about having had a warrant for his arrest. Rojas argues the evidence was insufficient to establish he had the requisite knowledge or intent to aid and abet a murder. Rojas also raises several evidentiary issues.

We conclude the evidence is sufficient to support Ramirez's conviction for first-degree murder, and the trial court did not abuse its discretion by denying his motion for mistrial. As to Rojas, however, we find insufficient evidence he had the knowledge or intent required to aid and abet a murder. Accordingly, we affirm the judgment against Ramirez and reverse the judgment against Rojas with directions to enter a judgment of acquittal.

FACTUAL AND PROCEDURAL BACKGROUND

In a joint trial, separate juries convicted Ramirez and Rojas of premeditated murder in connection with the August 2021 killing of Manuel Zamora. (Pen. Code, § 187, subd. (a).) The juries also found true a different gun allegation for each defendant. Ramirez and Rojas were sentenced, respectively, to 50 years to life and 26 years to life.

The murder occurred in Perris near the trailer where Zamora lived. Anita D. allowed Zamora to stay in the trailer on her property. In exchange, he was supposed to work as a handyman and help care for Anita's disabled sister.

In July 2021, Anita suspected Zamora of growing marijuana on her property. She also knew Zamora had stolen parts from cars that were parked

2

on her property, including parts from her Honda which Zamora had installed on his own Honda.

Anita had often enlisted Rojas ("Sirena") to resolve issues she was having with Zamora. Rojas was paralyzed, confined to a wheelchair, and unable to walk. He was homeless and had previously lived in his pickup truck on Anita's property but was then living out of his truck in a nearby homeless encampment by a water tower. Anita viewed Rojas as a father figure of Zamora's. According to Anita, Zamora usually listened to Rojas. If Anita asked Rojas to talk with Zamora about some problematic behavior, it would usually stop.

Around 3:00 p.m. on August 6, 2021, about one hour before Zamora was killed, Anita happened to encounter Rojas at a Circle K gas station near her home. Rojas was driving his silver Chevrolet Silverado truck with a trailer. Ramirez ("Catracho") was in the passenger seat next to Rojas. Anita walked up to Rojas's truck and spoke to him about Zamora's theft of parts from her car and her suspicions that he was growing marijuana. She asked Rojas to talk to Zamora the next time he visited her property and tell him to "knock it off." She told Rojas she wanted him to tell Zamora to "stop stealing from" her. Anita never meant for Rojas to do anything other than talk to Zamora. She may also have spoken to Rojas about renting him a room at her house.

During this conversation at the Circle K, Rojas told Anita that Zamora had also stolen a catalytic converter from his Chevrolet Silverado. Rojas had told others about this in the preceding weeks and expressed anger about it but never mentioned a desire to take revenge or commit any violence against

3

Zamora.[1]  He did not seem upset when he told Anita about it.  In response to Anita's request to talk to Zamora, Rojas told her, "I'll be by."

A surveillance video from the Circle K encounter was played for the jury.  The video captured Anita walking towards Rojas's truck and trailer.  She appeared to be on her way to speak to the driver.  After Anita left in another vehicle, the video showed Ramirez exiting the truck and entering the store.

About one hour later, Zamora was at Anita's property in his Honda with his girlfriend Beatrice and his close friend Santiago ("Chamuco").  Anita was not home.  Anita's daughter Tina was at the house with her friend Monique.  Anita's sister who lived at the house was there as well.

Beatrice got out of Zamora's Honda and into another vehicle with a man named Tony.  Santiago remained in the back seat of Zamora's Honda directly behind Zamora in the driver's seat.  Both vehicles started to leave the property around the same time.[2]

As these two vehicles were leaving, Tony saw Rojas and Ramirez drive up in Rojas's truck and trailer.  Rojas was the driver and Ramirez the passenger.  Tina also saw Rojas's truck and trailer pull up next to the house, then do a U-turn.  The truck parked on a dirt road near the property.

Zamora decided to drive up to Rojas's truck and speak to him.  With Santiago still sitting in the back seat directly behind him, Zamora drove his

---

[1]    The record does not reflect how or when Rojas had the catalytic converter repaired, but he was driving his Chevrolet Silverado again on the day of the shooting.  According to Tina, the theft of Rojas's catalytic converter occurred about a month or so before the shooting.  According to Santiago, it was a few weeks before.  According to Anita, it was about five days before.

[2]    Shortly before the shooting, two men arrived and asked Zamora where they could sell a catalytic converter.  They left after Zamora gave them a contact.  One of the men lived in the same homeless encampment as Rojas.

Honda and parked it right next to Rojas's truck so that Zamora's window lined up with the passenger window of the truck where Ramirez was sitting. With everyone still seated in the two vehicles, Rojas and Zamora struck up a "peaceful" conversation through the open windows. They talked about Rojas renting the room from Anita. According to Santiago, their conversation lasted about three to four minutes.

The conversation was interrupted when Ramirez suddenly got out of the truck holding a revolver, cocked the gun to make the trigger easier to pull,[3] held the barrel to Zamora's head, and started berating him and calling him an "asshole." After about 20 seconds to a minute, Ramirez shot Zamora once in the head. According to Santiago, Ramirez did not appear surprised the gun had gone off. Ramirez then pointed the gun at Santiago and told him, "you didn't see anything."

Santiago told law enforcement that immediately before the shooting, Ramirez repeatedly demanded that he and Zamora get out of the car. Zamora responded, "What do you mean?" Ramirez told him, "Get out. Get out. Get out." When Zamora then made a movement, Ramirez shot him in the head.

Ramirez got back into the truck and he and Rojas drove away. Zamora died at the scene from a contact gunshot wound. The next day, law enforcement arrested Rojas at the homeless encampment where he had been staying. At the time of arrest, he was seated in his wheelchair in his Chevrolet Silverado truck. The following day, Ramirez was also arrested after a vehicle pursuit.

---

[3]    Only the Ramirez jury heard Ramirez's statement about cocking the gun. The Rojas jury did not hear any evidence about Ramirez cocking the gun. Santiago did not testify that he saw or heard Ramirez cock the gun.

5

Both defendants gave interviews to investigators. A videotape of each defendant's interview was played for their respective juries.

In Ramirez's interview (not heard by the Rojas jury), Ramirez admitted shooting Zamora but denied going to Anita's property with the intent to shoot or kill him. Ramirez described Anita as being almost in tears when she told them about Zamora stealing parts from her car. At the scene, when Rojas and Zamora were talking about Rojas renting a room from Anita, Ramirez got mad because he felt Zamora was humiliating Rojas. Ramirez got out of the truck with the gun in his hand because he wanted to give Zamora "a couple of smacks upside the head." According to Ramirez, he only fired the gun because it looked like Zamora was going to grab something and he got scared. Ramirez characterized the shooting as an accident and claimed he was surprised the gun fired because he had forgotten he had cocked it. Ramirez told the police he "reacted like an idiot" and Rojas "had nothing to do with it." In the interview, Ramirez described Zamora as a "crook," an "asshole," and a "motherfucker."

In Rojas's interview (not heard by the Ramirez jury), Rojas gave several different versions of events. At first, he claimed he had gone to Anita's property alone to see about renting a room but then left because she was not there. Rojas later said he saw Anita at a gas station, where a Honduran stranger (Ramirez) offered to help him pump gas and asked him for a ride to Anita's. They drove to Anita's then left together without incident. Rojas later admitted talking to Zamora at the scene about renting a room from Anita but claimed nothing else happened. According to Rojas, he had known Zamora for about three years and considered him to be like a nephew. Rojas acknowledged Zamora had previously stolen something from

6

his truck, which made Rojas mad at first, but said Zamora had apologized and everything was good.

Rojas eventually admitted that Ramirez got out of the truck at the scene and told Zamora to "get out of the car" but Zamora did not comply. Ramirez then opened Zamora's door, pushed Zamora to the side, and tried to get into the driver's seat. He was trying to take Zamora's car. Zamora would not give up his car, so Ramirez got back into Rojas's truck and they drove away. Rojas claimed he did not know why Ramirez would try to take Zamora's vehicle.

The investigators finally told Rojas that Zamora was dead and demanded he start over and tell the truth. Rojas then said that when he and Ramirez ran into Anita at the gas station, she told them Zamora had stolen parts from her car and installed them on his own car. Rojas admitted he knew Ramirez "a little" and they had spent the afternoon together. After the encounter with Anita, Ramirez asked Rojas to take him to Anita's house and said he wanted "to go see this fool" Zamora and "teach him a lesson." Ramirez did not tell Rojas what he was planning. Rojas drove him over to Anita's property. After Rojas and Zamora struck up a conversation, Ramirez stepped out of the truck, pulled a gun from his waist, and told Zamora, "Get out of the car." Rojas had not seen the gun before Ramirez got out of the truck. Zamora told Ramirez, "I don't want to get out of the car." Ramirez then shot Zamora, got back in the truck, pointed the gun at Rojas, and demanded to be driven away. Rojas drove Ramirez away and dropped him off near a taco shop.

## DISCUSSION

## I

## Ramirez Has Not Demonstrated Any Reversible Error

A.  *Evidence of Premeditation and Deliberation*

Ramirez contends his conviction for first-degree murder should be reversed because there is insufficient evidence of premeditation and deliberation.  We disagree.

In assessing the sufficiency of evidence to support a conviction, a reviewing court views the record "in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)  In doing so, we "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Ibid.*)  The relevant question for purposes of substantial evidence review "is whether, in light of all the evidence, '*any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'" (*Ibid.*)

The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, not isolated bits of evidence favoring the prosecution. (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.)  Evidence that merely raises a suspicion of guilt, no matter how strong, is not sufficient to sustain the conviction. (*People v. Lara* (2017) 9 Cal.App.5th 296, 319 (*Lara*).)  In our substantial evidence review, we must take into account the standard of proof the jury was required to apply. (*People v. Soriano* (2021) 65 Cal.App.5th 278, 281, 284 [citing *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1000–1001].)  "[T]hat is why in criminal cases we must ensure the record

8

demonstrates substantial evidence to establish guilt beyond a reasonable doubt." (*People v. Renteria* (2022) 13 Cal.5th 951, 970.)

Murder is the "unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).) A murder perpetrated by a "willful, deliberate, and premeditated killing" is first-degree murder. (*Id.*, § 189, subd. (a).) "Premeditated" means considered beforehand, and "deliberate" means formed or arrived at or determined as a result of careful thought and weighing of considerations for and against the proposed course of action. (*People v. Lee* (2011) 51 Cal.4th 620, 636 (*Lee*).) "The process of premeditation and deliberation does not require any extended period of time. The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." (*Ibid.* [cleaned up].)

A first-degree murder conviction will be upheld when "the proof is such as will furnish a *reasonable foundation* for an inference of premeditation and deliberation." (*People v. Anderson* (1968) 70 Cal.2d 15, 25–26.) Evidence of planning activity, motive, and manner of killing is relevant, but "these factors are not exclusive, nor are they invariably determinative." (*Lee, supra*, 51 Cal.4th at p. 636 [cleaned up].) We also consider "any other evidence supporting an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." (*People v. Alvarez* (2025) 18 Cal.5th 387, 470 [cleaned up].)

The evidence here is sufficient to establish beyond a reasonable doubt that Ramirez deliberated and premeditated the killing. As for planning activity, Ramirez brought a loaded firearm to confront Zamora, pulled it out at the scene, and pointed it at Zamora's head for 20 seconds to a minute before the shooting. (See, e.g., *Lee, supra*, 51 Cal.4th at p. 636 [defendant's

9

decision to bring a loaded handgun indicated "he had considered the possibility of a violent encounter"].) Ramirez also cocked the gun before confronting Zamora, which is further evidence that he considered the shooting beforehand. (See, e.g., *People v. Salazar* (2016) 63 Cal.4th 214, 245 [defendants "both cocked their guns as they approached" the victim, "strongly suggesting they were contemplating a shooting"].) As for the manner of killing, Ramirez fired the gun into Zamora's head from close range, which is "indicative of a deliberate intent to kill." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [evidence that the defendant fired a shot at vital area of victim's body represented "a manner of killing indicative of a deliberate intent to kill"].) As for motive, the jury could reasonably conclude that Ramirez intended to steal Zamora's car or otherwise teach Zamora a lesson for stealing car parts, and he made the final decision to shoot Zamora because Zamora refused his repeated demands to get out of the vehicle. (See *ibid.* [motive to effectuate robbery supported finding of premeditation and deliberation].) Taken together, this evidence supported an inference that Ramirez had time to think about what to do, considered the shooting beforehand, and weighed the consequences before pulling the trigger with the intent to kill Zamora after he resisted Ramirez's demands. Thus, there is sufficient evidence to support Ramirez's first-degree murder conviction.

B.    *Ramirez's Motion for a Mistrial*

1.    *Additional Background*

In addition to his murder case, Ramirez was also being prosecuted in other cases related to stolen cars. He moved in limine under Evidence Code section 352 to exclude evidence of those other cases. The court granted Ramirez's motion.

The prosecutor played for Ramirez's jury a video recording of his complete post-arrest interview and introduced a transcript of the interview into evidence. As the trial court observed, Ramirez "talked a lot during his interview," and often "went off on different tangents." In one such exchange after Ramirez complained about the difficult things he has dealt with, the investigator asked, "where was your girlfriend?" He responded that she had been "assaulting" him and breaking his car windows. Ramirez then volunteered that someone "said that he was going to call the police and called the police and since I had an arrest warrant also because I didn't do things right like going to court and all that."

To avoid drawing the jurors' attention to this statement, Ramirez did not object at the time. But after the video recording had been played and outside the presence of his jury, he made an oral motion for a mistrial claiming that its admission violated the court's order granting his motion in limine. The court denied Ramirez's mistrial motion after determining that any error in admitting this statement was harmless. It found persuasive that the statement did not refer to any specific case and was a single, spontaneous utterance during an interview whose transcript was over 100 pages long. Ramirez did not ask for, nor did the court on its own give, an admonishment to the jury to disregard that comment.

2. *Ramirez's right to a fair trial was not prejudiced*

Ramirez argues that the trial court should have granted his motion for mistrial because his statement about having had an arrest warrant irreparably prejudiced the jury against him. The People counter that this spontaneous, passing statement did not impact his right to a fair trial when considered against their compelling case showing a premeditated murder. We agree with the People.

11

"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. A motion for a mistrial should be granted when a defendant's chances of receiving a fair trial have been irreparably damaged." (*People v. Collins* (2010) 49 Cal.4th 175, 198 [cleaned up].) "[W]e use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial." (*People v. Bolden* (2002) 29 Cal.4th 515, 555.)

There was no abuse of discretion. The trial court acted reasonably in concluding that any prejudice to Ramirez from his fleeting reference to an arrest warrant did not irreparably damage his chances of receiving a fair trial. "It is only in the exceptional case that the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions." (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1429 [cleaned up].) Defense counsel could have requested an admonition to cure any possible harm. Even without an admonition, it is improbable the jurors inferred anything from this isolated statement because it did not refer to a specific criminal charge or case and was never mentioned again in trial. We see no reasonable probability the jury would have used this vague remark to infer Ramirez was disposed to commit murder. In these circumstances, the trial court did not abuse its discretion in denying the motion for a mistrial. (See, e.g., *People v. Edwards* (2013) 57 Cal.4th 658, 703 [brief and isolated reference to defendant's arrest for another offense did not compel mistrial]; *People v. Valdez* (2004) 32 Cal.4th 73, 124–125 [isolated reference to defendant having been in prison not so grave that a curative instruction would not have mitigated any possible prejudice]; *People v. Franklin* (2016)

248 Cal.App.4th 938, 956 [vague and fleeting references to defendant's criminal history did not result in incurable prejudice or denial of fair trial]; *People v. Harris* (1994) 22 Cal.App.4th 1575, 1581 [incidental remark about defendant's parole status not prejudicial].)

II

There is Insufficient Evidence to Support Rojas's<br>Aiding and Abetting Conviction

Rojas argues there is insufficient evidence to support a finding that he had the requisite knowledge or intent to aid and abet a murder. We agree.

A.   *Applicable Law*

A person who aids and abets the commission of a crime is culpable as a principal in that crime. (Pen. Code, § 31.) Because the Legislature has eliminated the natural and probable consequences theory of aiding and abetting for murder liability, only a theory of direct aiding and abetting remains. (*Id.*, § 188, subd. (a)(3)); *People v. Gentile* (2020) 10 Cal.5th 830, 843–851.) For direct aiding and abetting, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with knowledge of the direct perpetrator's unlawful intent and with an intent to assist in achieving those unlawful ends. (*Id.* at p. 843.)

When the offense charged is a specific intent crime, such as murder, "the accomplice must share the specific intent of the perpetrator; this occurs when the accomplice knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. What this means here . . . , is that *the aider and abettor must know and share the murderous intent of the actual perpetrator*." (*In re Lopez* (2023) 14 Cal.5th 562, 585 [cleaned up and italics added].) That is so because "[t]he essence of aiding and abetting is involvement in the crime of another. The aider and abettor

13

must become 'concerned' with the crime itself. (Pen. Code, § 31.) A person chooses to become a part of the criminal activity of another and says in essence, 'your acts are my acts.' " (*People v. Curiel* (2023) 15 Cal.5th 433, 468 [cleaned up].)

"Mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime, although these are factors the jury may consider in assessing a defendant's criminal responsibility. Likewise, knowledge of another's criminal purpose is not sufficient for aiding and abetting; the defendant must also share that purpose or intend to commit, encourage, or facilitate the commission of the crime." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529–530 [cleaned up].)

Although evidence of an aider and abettor's knowledge and intent is often circumstantial, presenting a factual question for the jury, we have an independent obligation to assess whether there is sufficient evidence in the record to support the conviction. (See, e.g., *Lara, supra*, 9 Cal.App.5th at pp. 321–325 [insufficient evidence of aiding and abetting liability for murder].) "While it is the jury, not the appellate court which must be convinced of the defendant's guilt, in order to affirm, we must be able to conclude the evidence is sufficient to have convinced that jury of the defendant's guilt beyond a reasonable doubt." (*Id*. at p. 320 [cleaned up]; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320 [conviction based on insufficient evidence violates due process clause of Fourteenth Amendment].) We again apply the substantial evidence test in deciding this sufficiency question.

B.    *Analysis*

Based on our review of the record as a whole, we conclude there is no substantial evidence to establish beyond a reasonable doubt that Rojas knew

14

and shared Ramirez's intent to kill Zamora.  No one disputes that it was the chance encounter with Anita at the Circle K gas station about an hour before the shooting that set in motion the chain of events.[4]  In this conversation, Anita told Rojas about Zamora stealing parts from her car and growing marijuana on her property.  She asked Rojas to speak to Zamora and "teach him a lesson" so he would "knock it off."  Anita viewed Rojas as a father figure of Zamora's and had asked him to intervene with Zamora on similar occasions in the past.  According to Anita, Zamora usually listened to Rojas. Anita did not in any way suggest to Rojas that she wanted Zamora killed this time around.

Upon learning of Anita's problems with Zamora, Ramirez declared that he wanted to "see this fool" and "teach him a lesson."  But the record discloses no reason for Rojas to have suspected the "lesson" Ramirez intended would involve killing Zamora.  According to Rojas, he was not well acquainted with Ramirez and only knew him "a little."  There is no contrary evidence. Moreover, teaching someone a lesson generally means doing something to deter the person from repeating their bad behavior.  (Merriam-Webster Dict. Online (2025) <https://www.merriam-webster.com/dictionary/teach%20 %28someone%29%20a%20lesson> as of December 18, 2025, archived at <https://perma.cc/L3DC-27YJ>.)  This presumes the target will live to absorb the lesson and alter their conduct.  It does not ordinarily mean killing the person, particularly not when the ones teaching the lesson are acting at the behest of someone else (Anita) who has made no suggestion of murder and merely wants the troublemaker to "knock it off."

---

[4]     As the prosecutor put it in closing argument to the Ramirez jury: "What we do have is a happenstance meeting at a gas station which set forth a chain of events which led Mr. Ramirez to make a decision to put a barrel of a gun against that young man's head and pull the trigger."

No other evidence in the record supports an inference that Rojas knew the "lesson" called for Ramirez to kill Zamora. Most importantly, there is no evidence Rojas knew Ramirez was armed with a firearm before Ramirez "suddenly" got out of the truck to confront Zamora at the scene. Even then, there is no evidence Rojas knew the firearm was loaded. (See *People v. Keel* (2022) 84 Cal.App.5th 546, 559, 562 [even though defendant was carrying firearm and knew shooter had one as well, there was no evidence he knew shooter's firearm was loaded so as to support finding of reckless indifference to human life].)

Although the Attorney General suggests that Rojas must have known Ramirez was armed because they were sitting next to each other in the truck, this would be a reasonable inference only if there were evidence that Ramirez was carrying the firearm openly rather than concealed on his person. Because there was no such evidence, this is pure speculation. The only evidence on this question is Rojas's statement that he did not see the gun until Ramirez got out of the truck and pulled it from his waist.

Moreover, there was also evidence that Ramirez ultimately decided to shoot Zamora in response to events as they unfolded at the scene. Specifically, there was evidence that after Ramirez got out of the truck with the firearm, he pointed it at Zamora, repeatedly ordered him out of the car, and shot Zamora *only* after he refused to comply with Ramirez's demands. And there was no proof that Rojas knew Ramirez intended to react in this manner if Zamora resisted his demands to get out of the car. (Cf. *People v. Emanuel* (2025) 17 Cal.5th 867, 892 (*Emanuel*) [insufficient evidence accomplice acted with reckless indifference to human life where shooter's acts "were not anticipated, but rather, 'a spontaneous response' to unexpected resistance from the victim"].)

16

The other evidence cited by the People is insufficient to establish that Rojas knew and shared Ramirez's intent to kill. The People rely on Rojas's presence at the scene and his failure to prevent Ramirez from committing the shooting. As noted, however, mere presence at the scene and failure to prevent someone else from committing a crime is legally insufficient to establish aiding and abetting liability absent other evidence. (CALCRIM No. 401; *Lara, supra*, 9 Cal.App.5th at p. 322.) The jury was so instructed.

Recent Supreme Court authority likewise cautions against placing too "much emphasis" on an accomplice's presence at the scene and failure to prevent a murder as a basis for drawing inferences about the accomplice's mental state. (See, e.g., *Emanuel, supra*, 17 Cal.5th at p. 890; see also *People v. Collins* (2025) 17 Cal.5th 293, 312 (*Collins*).) In circumstances where the accomplice's presence gives him a meaningful opportunity to act as a restraining influence, it may be reasonable to infer that he shared in the perpetrator's mental state. (*Emanuel*, at p. 889.) But when the events unfold quickly, this inference cannot be drawn "without some evidence in the record indicating that the defendant had a meaningful opportunity" to restrain the murderer. (*Id.* at p. 892.)

There is no such evidence here. Rojas was paralyzed, confined to a wheelchair, and unable to physically interfere in Ramirez's confrontation with Zamora. According to Santiago, "everything happened quickly." Only about 20 seconds to a minute elapsed between the time when Ramirez suddenly got out of the truck with the firearm and when he shot Zamora. Tina heard the gunshot within a minute or two after losing sight of Zamora's vehicle as it left the property, which was before his encounter with Ramirez and Rojas even began. In these circumstances, Rojas's mere presence at the

17

scene did not afford him a meaningful opportunity to restrain Ramirez or prevent him from committing the murder.

The People also cite the fact that Rojas purportedly expressed no surprise when Ramirez committed the shooting. This conclusion rests on the testimony of Santiago, the only eyewitness. But Santiago only testified that *Ramirez* expressed no surprise after the shooting. Santiago acknowledged he could not see Rojas's face at the time, so he was in no position to determine whether Rojas was registering surprise. Ramirez also pointed the gun at Santiago immediately after shooting Zamora, and Santiago was afraid Ramirez was going to kill him too. In these circumstances, the mere fact that Santiago did not recall hearing Rojas say anything after the shooting does not reasonably support an inference that Rojas knew the shooting was going to occur all along.

The People rely on evidence of Rojas's motive, i.e., Zamora's theft of his catalytic converter. But this begs the question: Motive to do what? Well before the Circle K encounter, Rojas already knew that Zamora had stolen his catalytic converter, but there is no suggestion in the record that he wanted to kill Zamora over it. It was only after his chance encounter with Anita at the Circle K—when Rojas learned of her separate problems with Zamora—that Rojas evidently decided to go along with the plan to "teach him a lesson." Because there is no evidence that either Rojas or Anita wanted to kill Zamora over their respective disputes with him, the motive evidence does not tend to prove that Rojas knew and shared Ramirez's murderous intent all along. Without reasoning backwards from what Ramirez ultimately did, and imputing the same intent to Rojas, it is entirely speculative to conclude that Rojas's motive established an intent to kill Zamora, rather than merely teach Zamora a lesson so he would "knock it off" as Anita requested.

18

The People also rely on the fact that Rojas and Ramirez "stopped [the truck] just short of the property." They contend this "raised a reasonable inference that they stopped to discuss and ensure they had their plan fully figured out." Aside from also being speculative, this does not support an inference that "their plan" involved killing Zamora. The location of the truck's parking spot does not reveal anything one way or the other about what kind of confrontation Rojas had in mind.

In closing argument, the prosecutor relied on additional evidence to suggest to the jury that Rojas was guilty of aiding and abetting the murder. The prosecutor referred to Santiago's subjective belief that Rojas's conversation with Zamora about renting a room was a "distraction . . . to put [Zamora] in a situation where he wasn't expecting anything to happen." Even assuming the conversation was a ruse, however, that does not mean it was a ruse to *kill* Zamora.

The prosecutor also relied on the fact that Rojas fled the scene of the shooting with Ramirez and failed to call the police. "However, flight may also 'be explained by a desire merely to disassociate oneself from an unexpected criminal activity.' " (*Lara, supra*, 9 Cal.App.5th at p. 323.) Rojas's decision "to flee the scene of a shooting does not support a reasonable conclusion [he] did so because of a consciousness of guilt rather than simple self-preservation or a desire to disassociate [himself] from what had just occurred." (*Ibid.*) As the driver of the truck that brought Ramirez and his gun to the scene, Rojas could reasonably have feared he would be implicated in the murder even if he never intended it to happen and did not realize Ramirez was armed. Moreover, Rojas did not continue to associate with Ramirez after the shooting in a way that might signal an endorsement of his conduct. Immediately after the shooting, Rojas dropped Ramirez off near a taco stand and did not see

19

him again before his arrest the next day. (See *ibid*. [flight from scene not probative of aiding and abetting where gang member accomplices immediately disassociated themselves from shooter and each other].)

Once again, our Supreme Court's decisions on accomplice liability have cautioned against relying on ambiguous post-shooting conduct (including flight or failure to render aid) to infer the mental state required for murder. (*Emanuel, supra*, 17 Cal.5th at p. 894; *In re Scoggins* (2020) 9 Cal.5th 667, 679–680; *People v. Clark* (2016) 63 Cal.4th 522, 620.) "[W]hen different inferences may be drawn from the circumstances, the defendant's actions after the shooting may not be very probative of his mental state." (*In re Scoggins*, at p. 679.) Because the post-shooting circumstances here "are susceptible to differing interpretations," they do not provide a meaningful basis "to infer [Rojas's] frame of mind concerning [Zamora]'s death." (*Emanuel*, at p. 894.)

Finally, the prosecutor relied on Rojas's lies to the police. This also does not support a reasonable inference Rojas had the necessary knowledge and intent to aid and abet a killing. (Cf. *Lara, supra*, 9 Cal.App.5th at pp. 323–325 [defendants' lies to police denying their presence during murder did not support convictions for aiding and abetting murder].) Rojas could have lied not because he was guilty of murder, but because he knew it would implicate him if he admitted he drove the shooter to the scene and fled with him. (See *id*. at p. 324 ["While [defendants] might have lied because they were conscious of their complicity in [victim]'s murder . . . , they might also have lied because they did not want to admit they were there and knew who murdered [the victim]"].) This explanation is "no more speculative than the assertion the lies were motivated by [his] consciousness of having aided and abetted the murder . . . ." (*Id*. at p. 325.) "Although we must draw all

20

reasonable inferences in favor of the prosecution, a 'reasonable' inference is one that is supported by a chain of logic, rather than, as in this case, mere speculation dressed up in the guise of evidence." (*Id*. at p. 324 [cleaned up].) "A jury must avoid unreasonable inferences and not resort to imagination or suspicion. Mere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof." (*Collins, supra*, 17 Cal.5th at pp. 307–308 [cleaned up].)

Viewing the record as a whole, we conclude there is no substantial evidence to support a finding beyond a reasonable doubt that Rojas knew and shared Ramirez's murderous intent. Although we recognize this is normally a factual question for the jury, we cannot affirm a conviction based on mere speculation or bare suspicion that an accomplice must have known what the perpetrator intended to do. The evidence is "not sufficiently solid or substantial to reasonably inspire confidence in [Rojas's] guilt." (*Lara, supra*, 9 Cal.App.5th at p. 325.)

C.   *Appropriate Disposition*

Because the prosecutor argued in the alternative that Rojas was guilty of aiding and abetting a second-degree murder, we requested supplemental briefing from the parties on the appropriate disposition. Specifically, we asked the parties to brief whether there was sufficient evidence to reduce Rojas's aiding and abetting conviction to an implied malice, second-degree murder. (See *People v. Nero* (2010) 181 Cal.App.4th 504, 513–518 [aider and abettor may be guilty of lesser homicide offense than actual perpetrator].) In the parties' supplemental briefing, the People argue there is substantial

21

evidence to support a reduction of Rojas's conviction to second-degree murder and Rojas argues there is not.[5]  We conclude there is not.

For an implied malice murder, the actual perpetrator must commit a "life-endangering act."  (*People v. Reyes* (2023) 14 Cal.5th 981, 991 (*Reyes*).)  This "act must not merely be dangerous to life in some vague or speculative sense; it must involve a high probability that it will result in death."  (*Id.* at p. 989 [cleaned up].)

" 'For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act.' "  (*Reyes, supra*, 14 Cal.5th at p. 991.)  " 'Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.' "  (*Ibid.*)  " 'The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' "  (*Ibid.*)  Where the life-endangering act is a shooting, the aider and abettor must know the perpetrator intended to shoot at the victim, intend to aid the perpetrator in the shooting, know the shooting was dangerous to human life, and act in conscious disregard for life.  (*Id.* at p. 992.)

We cannot reduce Rojas's aiding and abetting conviction to second-degree murder on the theory that the life-endangering act he aided and abetted was shooting Zamora.  As we have explained, there is insufficient evidence Rojas knew Ramirez intended to shoot Zamora or intended to aid

---

5    In their supplemental brief on this issue, the People cite to Ramirez's statement to law enforcement and related trial testimony about his statement.  We disregard this evidence in deciding this issue because it was not presented to the Rojas jury.

Ramirez in committing the shooting. Moreover, the only other acts Ramirez committed that could be considered life-endangering were bringing a loaded firearm to confront Zamora and pointing it at Zamora's head. Once again, however, there is no substantial evidence that Rojas knew Ramirez was armed with a loaded firearm or intended to assist Ramirez in using it. The People argue in their supplemental brief that Rojas did nothing to stop Ramirez or deescalate the situation in the 20 seconds to one minute after Ramirez got out of the truck with the gun and before he shot Zamora. As we have explained, however, Rojas's mere presence at the scene and failure to prevent Ramirez from shooting Zamora is legally insufficient to establish aiding and abetting liability absent other evidence. (*Lara, supra*, 9 Cal.App.5th at p. 322.)

We therefore conclude that no substantial evidence supports a reduction of Rojas's conviction to second-degree murder. Moreover, the People do not suggest there is any basis to reduce it to a manslaughter and we see none. We must therefore reverse Rojas's murder conviction for insufficient evidence without reducing it to a lesser form of homicide. For double jeopardy purposes, our finding of insufficient evidence is the functional equivalent of an acquittal and bars a retrial. (*Burks v. United States* (1978) 437 U.S. 1, 15–16; *People v. Hatch* (2000) 22 Cal.4th 260, 271– 272.)

## DISPOSITION

The judgment against Ramirez is affirmed.  The judgment against Rojas is reversed.

BUCHANAN, J.

I CONCUR:

O'ROURKE, Acting P. J.

Dato, J., Concurring and Dissenting.

I concur in the majority opinion to the extent it affirms the first degree murder conviction of Allan Nayib Melghem Ramirez. I respectfully dissent, however, from the majority's conclusion that there was insufficient evidence to support the conviction of codefendant Cesar V. Rojas for aiding and abetting Ramirez. In my view, evaluating the conflicting inferences to be derived from ambiguous, confused and inconsistent testimony is a quintessential jury function. Pointing to questions raised by the evidence is precisely what good lawyers do in their arguments to the jury. In this kind of setting, however, that no one's story makes complete sense is to be expected. It is unrealistic to demand that the prosecution's case will always be neatly wrapped and tied with a bow. But that does not mean that reasonable jurors, applying their common sense borne of varying life experiences, could not conclude beyond a reasonable doubt that Rojas knew of Ramirez's plan to kill Manuel Zamora and intentionally assisted in carrying it out.

A

That the victim was fatally shot by Ramirez is undisputed. My colleagues and I likewise agree that there is more than substantial evidence to support the jury's finding that Ramirez premeditated the murder. Our disagreement involves two competing interpretations of the evidence with regard to Rojas's role in Ramirez's premeditated killing of Zamora.

The prosecution theory is that after talking with Anita D. at the Circle K gas station and learning about her problems, which merely compounded problems that Rojas had already experienced, at some point over the next hour he and Ramirez developed a plan to kill the victim. They drove to Anita's property. While Rojas engaged Zamora in a friendly conversation to

allay any suspicions he might have, Ramirez got out of the truck, berated the victim while holding a gun to his head, and then shot him.  Rojas showed no surprise at what happened because he knew in advance what Ramirez had planned.

Rojas did not testify, so his alternative version of events was presented to the jury through videotape evidence of a story he told to investigators following his arrest, and through the arguments of his counsel.  In Rojas's alternative version, Ramirez is portrayed as the primary bad actor and Rojas as a mere pawn dumbfounded by the tragic turn of events.  Following the conversation with Anita at the Circle K, Ramirez allegedly became irritated on learning how Zamora had been stealing from both Anita and Rojas.  Rojas agreed to drive Ramirez to Anita's house.  Their object, as he understood it, was to encourage Zamora to modify his objectionable behavior—to teach him "a lesson"—but Ramirez did not tell him what he had planned.  When they arrived at Anita's property, however, Zamora drove up and parked alongside Rojas's truck.  While the two friends engaged in casual conversation, Ramirez got out of the truck, pulled out a revolver and ordered Zamora to exit his vehicle.  When Zamora objected, Ramirez shot him.  Ramirez then got back into the truck, pointed the gun at Rojas and said, "Let's go."  A short time later, Ramirez exited the truck, warning Rojas, "Don't say anything."

What really happened outside Anita's house?  Which version of the story is accurate, if either is?  Sorting everything out is why we have a jury system.  And my fundamental concern with the majority's analysis involves the jury's time-honored function as fact finder in our criminal justice system and the limited role of the courts in assessing the sufficiency of the evidence presented to the jury.

2

As the majority recognizes, we must "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)  This means that even where "the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might reasonably be reconciled with the defendant's innocence." (*Ibid.*)  Indeed, the jury can entirely reject the testimony of a witness it finds was willfully false.  (*People v. Reyes* (1987) 195 Cal.App.3d 957, 965.)  The only relevant question for the appellate court is "whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Towler* (1982) 31 Cal.3d 105, 118.)

In my view, this case is about the reasonable inferences that can be drawn from a messy tangle of testimony provided by people who are generally uncomfortable interacting with law enforcement and the justice system.[1]  They will be accurate when it suits them, and often otherwise when it does not.  Untangling the accurate and inaccurate threads is a task the jury is uniquely suited and entitled to perform.

B

Rojas emphasizes there is no direct evidence that he agreed with Ramirez to kill Zamora in the hour or so before the shooting.  He then points to specific pieces of evidence relied on by the prosecution in an effort to explain why they do not necessarily indicate the existence of such a plan.  What is left, according to Rojas, is mere "speculation" that the two defendants plotted to murder Zamora.

---

[1]    As one of the investigating detectives explained it, for the most part "the people that we encounter on homicides do not want to talk to the police."

3

But this focus on the specifics misses some important elements of the big picture. We know, for instance, that Rojas and Ramirez must have discussed Zamora before they drove to Anita's. Ramirez knew neither Anita nor Zamora well, and he spoke only Spanish. When they talked at the Circle K, Anita spoke only English to Rojas, complaining about the problems she was having with Zamora. Ramirez had no way of learning about those problems—and becoming irritated with Zamora's behavior—except from Rojas after Anita left. Jurors could fairly ask themselves why Rojas would share Anita's complaints with Ramirez in sufficient detail for him to become upset if not to enlist his assistance.

Such an inference is also supported by the state of the existing relationships. To accept Rojas's alternative version of events, one has to assume that Ramirez planned the killing without Rojas's knowledge. To support this version, Rojas continued to maintain it was Ramirez who first proposed driving to Anita's house to confront Zamora. Yet Ramirez, in the vernacular, had no dog in this fight. He hardly knew either Anita or Zamora, and he had no particular motive to hurt Zamora or help Anita. Rojas, on the other hand, had a close relationship with both. Although the closeness of his relationship with Zamora might cut against a motive to kill him, there was evidence that the relationship had been recently strained. A reasonable jury could conclude that Anita's complaints became the straw that broke the camel's back in terms of Rojas's relationship with Zamora.

## C

By far the most important reason why the evidence of Rojas's guilt presents a jury question is the sheer unbelievability of Rojas's own statements. When we speak of Rojas's "alternative version" of events, of course we mean the interpretation that his counsel ultimately argued to the

4

jury at trial. But in truth, Rojas told many different stories over the course of a 90-minute interview with detectives. I believe it is Rojas's repeated unwillingness to tell the truth when confronted by contrary facts that caused the jury to conclude, not unreasonably, that none of his testimony was credible.

When Rojas was first questioned, he started with Version 1 of his story. On the day of the killing, he said, he spent the entire day at the "water tower," by himself. He never left and spent the night there. He added that it had been a month and a half since he hauled a car on a trailer.

So began a series of interactions with the interrogating officers in which they expressed disbelief about certain portions of Rojas's story based on other information they had gathered. Rojas, in turn, would modify his story to account for the new information. For instance, the officers next told him they had a picture of Rojas's car with an attached trailer at a location other than the water tower at around 4:00 in the afternoon. So in Version 2 of his story, Rojas admitted the car was his, and now said he had driven to his friend Paco's house. A few minutes later, he agreed he had also gone to Anita's house, but claimed he only saw two people—Tony and Beatrice—after which he returned to a nursery to drop off the car trailer.

Prompted by the officers' reference to cell phone tower data and video evidence, Rojas next acknowledged in his Version 3 that there was a second person he had never met before–who turned out to be Ramirez—with him in his car. According to Rojas, he met the individual at a Circle K gas station where this "fool" asked for a ride to Anita's house. Rojas agreed. But because Anita was not home, Rojas then dropped the as-yet unidentified man off at a taco shop. He maintained the man never gave him his name.

At this point the interrogator paused, explaining to Rojas that he was talking to him about "something very significant [that] happened to you yesterday" and "the way you're telling me this story, you're leaving a lot . . . out." Attempting to reassure Rojas, the detective said he understood "how you might feel emotionally." He could appreciate that Rojas was "scared." But he knew that Rojas was "not being honest right now" and Rojas needed to understand that "the difference between things going better for you and going worse, is you actually telling the damn truth."

If Rojas then had "come clean" and offered the final version of his story, an explanation that he was distrustful of law enforcement and afraid of implicating himself in the killing of his friend might have carried weight with the jury in excusing or at least mitigating his initial lies. Instead, Rojas doubled down. He insisted that the man at the Circle K never revealed his true name. Rojas knew him only as "Catratcho," which is a slang term referring to someone from Honduras. Rojas reiterated he drove Catratcho to Anita's house, saw only Tony and Beatrice, then drove back to the taco shop.

The detective next questioned Rojas about whether he had seen Zamora at Anita's house. Rojas initially denied seeing Zamora, who he said was "like my nephew." Pressed by the detective based on statements from Beatrice and Anita's daughter Tina that they had seen Rojas talking to Zamora, Version 4 of the story apparently abandoned the assertion that it was Catratcho who asked to be driven to Anita's. Instead, Rojas admitted he drove to Anita's to inquire about renting a room from her. Zamora drove up while Rojas was at Anita's house. Rojas claimed the two men had a conversation—but "not a long conversation"—about a room for rent. Rojas insisted that "[n]othin' else happened." And during the entire conversation, Catratcho remained seated in the front passenger seat.

6

Version 5 of Rojas's story was prompted by the officer's reference to surveillance video from the interaction at Anita's house: "Did the guy from Honduras get out of the car? Remember before you tell me any different, I just showed you the surveillance video." Rojas conceded, "Yeah, he got out" and then "he told [Zamora] to get out of [his] car." When Zamora refused, Catratcho tried unsuccessfully to push Zamora from the driver's seat. Catratcho then retreated to Rojas's truck, after which Rojas dropped off him at the taco shop.

The version of the story Rojas finally settled on (Version 6) started with Anita telling defendants about Zamora stealing car parts and asking Rojas to "teach him a lesson."[2] Rojas went back to asserting that Ramirez told him to drive to Anita's property, where they were approached by Zamora. After Rojas struck up a conversation with Zamora about renting a room at Anita's, Ramirez stepped out of the truck, brandished a gun, shot Zamora, got back in the truck, and demanded that Rojas drive away. When he jumped out of the truck a short time later, Ramirez told Rojas, "Don't say anything." Rojas then drove to a nearby nursery, where he claimed to have told someone named "Javier" about the shooting. When asked by the detective why he didn't call the police after he saw his friend Zamora shot, Rojas replied,

_____

[2]　Rojas suggests that a plan to teach Zamora "a lesson" was inconsistent with an intent to kill because "he would be dead and not learn anything from the experience." The argument assumes an unrealistic level of semantic precision. Particularly in this social setting, teaching "a lesson" can refer generically to payback for a transgression. (See, e.g., <https://www.collinsdictionary.com/us/dictionary/english/to-teach-someone-a-lesson> ["punish them for something that they have done so that they do not do it again"] as of December 18, 2025, archived at <https://perma.cc/4R46-KFY3>; <https://Teach me a lesson - Idioms by The Free Dictionary> ["to get even with someone for bad behavior"] as of December 18, 2025, archived at <https://perma.cc/KJ4S-S8AZ>.)

"I was scared." He agreed with the detective, however, that "it doesn't look all that good, does it?"

D

The prosecution argued that the jury could reasonably reject Rojas's alternative version of events because his implicit claim of ignorance and surprise when Ramirez shot Zamora was inconsistent with several aspects of his behavior after the shooting. Rojas attempts to explain away this allegedly inconsistent behavior with reasoning the majority opinion largely accepts.

Rojas admitted that Zamora was like a nephew to him, a characterization confirmed by Anita. If Rojas's story is to be believed, although he told Anita he would "talk" to Zamora about stealing other people's property, Rojas had no intent to harm or threaten him. Equally important, he had no idea Ramirez had a gun until Ramirez got out of the truck and pulled the handgun from his pocket or waistband.

Assuming all this was true, Rojas then watched as Ramirez, a man he hardly knew, cocked the hammer of the revolver, put it up to Zamora's head, yelled at him for at least 20 seconds and perhaps as much as a minute, and then shot him execution style.[3] Yet according to the only uninvolved eyewitness (Santiago), Rojas did nothing. More importantly, perhaps, even Rojas in his statement to police never claimed to have done anything to interrupt the unfolding tragedy. In his briefing, Rojas explains that he was confined to a wheelchair and argues there was really nothing he could *do* to

---

[3]  In closing argument, Rojas's counsel conceded that Rojas knew Ramirez shot Zamora: "This is someone who just saw or heard someone close to them, inches away next to them in the truck, get shot. That we do know. Because whether he saw it or heard it, we know he knows Manuel's shot."

intercede.  Even if this were accurate, he could have *said* something.  Indeed, if these assertedly shocking events were unfolding before his eyes, directed at someone who he treated like family, it would be difficult *not* to scream something.  Yet neither in Santiago's account, nor in the final version of Rojas's statement in which he finally acknowledged the shooting of Zamora, did Rojas express surprise at what had transpired.  And after he dropped off Ramirez and no longer felt threatened, Rojas called no one to report the shooting or even check on Zamora's condition, which the jury could have found was possible to do without implicating himself.

Rojas's lack of affect continued during the recorded video interview with detectives, which took place a little more than a day after the shooting and was played for the jury.  In between Version 5 and Version 6 of Rojas's story, the following exchange took place between Rojas and Investigator Robertson, the principal interviewer:

> "[ROBERTSON:]  I'm . . . talking to you—because I know what happened.  'Kay?  I Know.  I know and you know that Manuel's dead.  Kay?  I'm tryin' to figure out . . .
>
> "[ROJAS:]  Manuel's dead?
>
> "[ROBERTSON:]  Yes, Manuel's dead.  You know damn well Manuel's dead.
>
> "[ROJAS:]  No.
>
> "[ROBERTSON:]  Yeah, you do.
>
> "[ROJAS:]  I didn't know.
>
> "[ROBERTSON:]  'Kay?  Listen to me.  You know Manuel's dead.  You know that.  I'm trying to figure out why you would drive this man over there, and he killed Manuel.  Because listen to me, I'm gonna tell you somethin'.  When you decide to tell me the truth – if you don't decide to tell

9

me the truth, you're gonna go to jail for a very – very long time. 'Kay? So with that being said, can we start over and you tell me the truth?

In closing argument, the prosecutor focused the jury on this exchange in arguing that Rojas was "acting like someone who is involved in the murder and helped perpetrate the murder." "Ladies and gentlemen, at 55 minutes and 44 seconds, this is Investigator Robertson [is] telling [Rojas that] Manuel is dead. He has no change of expression. His face remains the same, and he just stares at him."

Making this type of evaluation is precisely why we have juries. It is the jury's job not merely to listen to testimony, but to observe the witness's behavior *while* testifying in order to assess how much of the testimony, if any, should be believed. (See CALCRIM No. 105 ["If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says"].) The jurors in this case were fully entitled to assess Rojas's behavior at the scene of the shooting, evaluate his demeanor during the interview, and decide it was inconsistent with his assertion that he did not know Ramirez meant to kill Zamora. Rather, they could properly conclude he knew of Ramirez's plan and intended to aid in accomplishing it.[4]

---

4     Having concluded there was sufficient evidence from which a jury could find that Rojas intentionally assisted Ramirez in killing Zamora, I similarly believe that if Rojas's understanding was limited to assisting Ramirez in *threatening* Zamora with a loaded handgun, there was enough evidence to support a conviction of second degree murder based on findings that Rojas intentionally assisted Ramirez in committing an act he knew was dangerous to human life and acted deliberately in conscious disregard for life. (See *People v. Reyes* (2023) 14 Cal.5th 981, 991; *People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 499.)

I would affirm the judgment in its entirety.


DATO, J.